Jessica Turk
Law Offices of Jessica Turk
State Bar No. 024916
PO BOX 1363
Vail, AZ 85641
Telephone: (520) 404-6802
*Jessica.h.turk@gmail.com*
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-01695-JAS-EJM |
|---|---|
| Plaintiff, | |
| vs. | **RESPONSE TO GOVERNMENT'S OBJECTION TO MAGISTRATE'S ORDER GRANTING DEFENDANTS' DISCOVERY REQUESTS** |
| Troy Jermaine Howell, | |
| Defendant. | |

Mr. Troy Jermaine Howell, through counsel undersigned, hereby files a response to the Government's Objection to Magistrate's Order Granting Discovery (hereinafter "Government's Objection") (Doc. No. 1764) on his behalf as well as on the behalf of his co-defendants who have previously joined one or more of the motions that precipitated the hearing (Doc. Nos. 767 and 847). Mr. Howell urges the District Court to find that the Magistrate's order granting discovery is neither contrary to law or clearly erroneous and ensure the Government discloses the items to the defense forthwith.

**A.** **Doc. No. 1774: Response to Government's Objection to Magistrate's Order Granting Discovery of Requested Items 38, 39, 44, and 45.**

One June 7th, 2022, Mr. Payson, who represents Co-defendant Samuel Rakestraw, filed a response to the Government's Objection. Consistent with its caption, Mr. Payson's

1

pleading only addressed items 38, 39, 44, and 45.  Defendants' counsel, with Mr. Payson taking on the task of writing an expedited partial response to the Government's 36-page Objection, argued that there were certain items of discovery that were especially time sensitive.  Items 38, 39, and 44, specifically, involve discovery that Agent Berlin had either authored or appeared to have special knowledge of.  Item 45 references Agent Berlin's personnel file in order to determine if it contains information that could be used for impeachment purposes.

All of these items were time sensitive because of the fact that Agent Berlin, the last witness slated to testify at the ongoing evidentiary hearing, gave testimony during the mornings of June 15th and 16th before Magistrate Judge Markovich.  The defense was hopeful that an expedited ruling, ideally issued prior to Agent's Berlin's testimony, might be possible if a response addressing only those objections related to Berlin's testimony was filed as soon as practicable. [1]

It is also significant that the main thrust of Mr. Payson's response as to items 38, 39, 44, and 45, was that Government missed the 14-day deadline to file objections to the Magistrate's May 18, 2022 order.  If, for any reason, this Court takes issue with the bifurcated nature of these responses, the defense would simply request that Mr. Payson's response be incorporated by reference into this response which, although filed after Mr. Payson's response, is still timely.[2]

---

[1] The Government's Objection was filed in the late afternoon on Friday, June 3, 2022.  Mr. Payson's response was filed on Tuesday, June 7, 2022.

[2] Mr. Payson's carefully crafted response clearly provided that "the defense expressly does not waive a response in opposition to the government's objections that are not addressed in this pleading.  The defense will address and

2

### B. Objections Waived by the Government

In addition to the Government's untimely objection as to items 38, 39, 44, and 45, there appear to be additional rulings made by the Magistrate that the Government is unhappy about, but which they failed to timely object. More specifically, the Government complains about the Magistrate's March 17, 2022 order granting an evidentiary hearing. See *Gov't Objection*, pg. 4. The Government's Objection also includes its distaste for the Magistrate's April 27, 2022, decision to permit Agent Berlin to testify at the evidentiary hearing. See *Id*. at pg. 32. While the Government can certainly choose to continue to express its dissatisfaction with the Magistrate's decisions, it is clear that the time to formally object to the setting of the evidentiary hearing or Berlin's testimony, has long passed.

### C. Standard of Review

Federal Rule of Criminal Procedure 59(a) directs district judges to consider timely objections to nondispositive pretrial orders issued by magistrate judges and to "modify or set aside any part of the order that is contrary to law or clearly erroneous." " A magistrate judge's finding is "clearly erroneous" if the district judge has a "definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948), 68 S. Ct. 525, 92 L. Ed. 746. "[R]eview under the 'clearly erroneous' standard is significantly deferential." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993). The defense submits that the Government has

---

oppose the remainder of the government's objections in a later filing." Doc. No. 1774, pg. 1. The defendants' response is due on or before June 17, 2022.

3

failed to demonstrate that Judge Markovich's discovery orders were either contrary to law or clearly erroneous.

### D.     One Hearing, Two Standards

Former defense counsel for Co-defendant Mr. Gray, filed two separate motions. The first, filed on September 13, 2021, is titled, "Motion to Dismiss Indictment for Selective Enforcement or, in The Alternative, Motion for Discovery". Doc. No. 767. The second, filed on November 4, 2021, is captioned, "Motion to Compel Production of Discovery Materials in Support of a Selective Prosecution Claim". Doc. No. 847. Quite logically, the Magistrate set an evidentiary hearing to address both motions, likely because both motions involve evidence of discriminatory intent and effect. Both motions would likely require the same witnesses as well. Thus, for efficiency reasons, the setting of one hearing made sense.

Just because there was one hearing to address both motions, however, does not mean that the two distinct discovery standards as to selective enforcement and selective prosecution ought to be conflated or that the motions should be treated together as a "mixed claim". See *Gov't Objection*, pg. 13. These are two separate motions invoking two distinctly different discovery standards.

As to both substantive claims of selective enforcement and prosecution, the defendant needs to show discriminatory purpose and discriminatory effect. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012). As to discovery standards, however, those are different. The discovery standard for selective prosecution requires that the defendant present "some evidence

4

tending to show the existence of the essential elements" of a selective prosecution claim. *Armstrong*, 517 U.S. at 468.  There is a lower standard, however, for discovery requests regarding selective enforcement than selective prosecution.  *United States v. Sellers*, 606 F.3d 848, 855 (9th Cir. 2018).  More specifically, "a defendant need not proffer evidence that similarly-situated individuals of a different race were not investigated or arrested to receive discovery on his selective enforcement claim…".  Rather, "the defendant must have ***something more than mere speculation*** to be entitled to discovery," and "the district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing."  *Id*. (emphasis added).

 1. *United States v. Sellers*

The Government's Objection appears to take issue with the Magistrate's application of *Sellers*.  The Government suggests that *Sellers* is only applicable to the very narrow category of cases involving reverse-sting operations.  There are several reasons why the Government's interpretation of *Sellers* is both illogical and untenable.  First, there is nothing in the *Sellers* opinion explicitly stating that the lower discovery standard is limited to reverse-sting operations.  Notably, the Government failed to cite any other case from the Ninth Circuit or otherwise supporting its extremely narrow interpretation.

Instead, the Government quotes one sentence in *Sellers* that ends with the words "in a stash house reverse-sting operation case" in an effort to qualify the entire holding.  See *Gov't Objection*, pg. 13.  The Government's hyperfocus on this sentence ignores the

rationale behind *Sellers*' much broader holding.  For instance, consider that in an effort to

defend its holding to the dissent, the *Sellers* Court provides:

> In conflating the standards for discovery in selective prosecution and selective enforcement claims, the dissent overlooks the main reason for distinguishing them: the presumption that *prosecutors* "properly discharged their official duties" absent "clear evidence to the contrary." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15, 47 S. Ct. 1, 71 L. Ed. 131 (1926)). Because "[t]he justifications for a rigorous standard for the elements of a selective prosecution claim" are not present in a selective enforcement claim, the latter does not "require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468.

*Sellers*, 906 F.3d at 856 (9th Cir. 2018).  There is nothing in the text above that sets any sort of limits on the holding in support of the Government's suggestion that *Sellers* is only meant to address reverse-sting operations.  Rather, the holding is based on the much broader justification that law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *Id*. at 853 (quoting *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (en banc)).

The Court goes on to draw distinctions between prosecutors and law enforcement actors.  Again, notably, there is no mention that such rationale ought to be limited to only those cases involving reverse-sting operations:

> Criminal defendants are allowed discovery for various aspects of law enforcement operations, including statements made and actions taken by investigating agents. Agents' investigatory decisions are regularly questioned at trial, and their credibility is put before courts and juries. Thus, agents occupy a different space and role in our system than prosecutors; they are not charged with the same constitutional functions, and their decisions are more often scrutinized by—and in—courts.
>
> Because the same presumption of regularity and deference to prosecutorial decision-making policy concerns do not apply in the selective enforcement context, we need not apply as rigorous a standard here.

6

This Court should also consider that the Government's requested interpretation of *Sellers* is inconsistent with the application of the holding in other courts. See, e.g., *United States v. Babichenko*, 2020 U.S. Dist. LEXIS 206600, at *1, (D. Idaho Nov. 3, 2020) (denying discovery in a **wire fraud** prosecution, "even under the lower standard for obtaining discovery for selective enforcement claims, described in *Sellers*…); *United States v. York*, 2021 U.S. Dist. LEXIS 50668, at *15 (S.D. Ill. Mar. 18, 2021) (citing *Sellers*' standard that "a defendant must have *something* more than mere speculation to be entitled to discovery" in a **sex crimes** prosecution in which the defendant sough discovery as to selective enforcement). The Government has not established that Judge Markovich's application of the *Sellers* standard to defendants' discovery requests was contrary to law. It is, in fact, the correct legal standard.

> **E.** **The Magistrate's Finding That Defendants Provided "More Than Mere Speculation" of Discriminatory Intent is Not Clearly Erroneous and Even If This Court Were to Find That *Armstrong* applies, The Defense Has Shown "Some Evidence" of Discriminatory Intent**

The evidence presented to the Magistrate throughout the evidentiary hearing thus far is "more than mere speculation" that the TPD/ATF investigative team in this case were motivated by racial animus. Interestingly, the Government's Objection cites to *United States v. Mumphrey*, 193 F.Supp.3d 1040 (N.D. Cal. 2016), a case, predating *Sellers*, in which the court utilized the more rigorous *Armstrong* standard and granted the defense request for discovery as to a claim of selective enforcement. The Government suggests that *Mumphrey*'s investigating officer caught on tape saying, "'[f]ucking BMs', referring

to black males" is the kind of evidence necessary, but absent from the instant case. *Gov't Objection*, pg. 14, fn. 7. The defense submits that the racial slurs made by various law enforcement agents in this case, are arguably at least equivalent to the slur in *Mumphrey*. Thus, even if this Court finds that the *Armstrong* standard ought to apply, the defense argument is that the racial slurs are "some evidence" of discriminatory intent. The evidence summarized below demonstrates that the Magistrate's finding is not clearly erroneous.

First, during a recorded interview of Mr. Samuel Rakestraw, Detective Barber, with Detective Frieberg and Agent Berlin sitting in attendance, said, "Nobody likes wings, Ethiopian-ass chickens. They're no good for nothing." *EH Transcript, 4/7/22 a.m.*, pgs. 82-83. Frieberg explained that Barber didn't like chicken wings. *Id*. at 84. There are only two explanations for why Barber chose to describe chicken wings as "Ethiopian-ass chickens". Either he was relying on the racist stereotype of the "starving African" or he was equating his dislike of chicken wings for his dislike of Africans. Frieberg certainly didn't offer an innocent explanation. All she could provide was that, "It sounds like Detective Barber." *Id*. at 85

In a separate recorded interview of Mr. Troy Howell by Detective Padilla, where again, Frieberg was present, Padilla began to accuse Mr. Howell of lying. Instead of simply calling him a liar, Padilla, while raising his voice, tells Mr. Howell, "You're lying, you were **bred** to lie!" (emphasis in the original audio recording). *EH Transcript, 4/4/22*, pg. 29. In an effort to support his claim that he was not equating Mr. Howell, a Black man, with an animal, Padilla attempted to explain that when he used the term "bred", he simply

8

1  meant that gang members, specifically, are "conditioned, raised, or bred to live a dangerous
2  lifestyle, involving dishonesty and criminal activity." *Id*. at pg. 32.

3        Padilla's purportedly innocent explanation fails, however, because in response, Mr.
4  Howell, seemingly a little shocked, tries to clarify by asking Padilla, "So when I came out
5  my momma's womb, I was bred to lie[?]". In response to Mr. Howell's question, Padilla
6  did not try to correct Mr. Howell's understanding by explaining that he wasn't alluding to
7  the reproductive process itself, but rather to being conditioned or raised a certain way. At
8  the evidentiary hearing, Padilla agreed that a newborn baby cannot have been "raised" or
9  "conditioned" to do or be anything. *Id*. at pg. 112.

10       Since Padilla's explanation fails, what is left is his very intentional choice of the
11 word "bred". Padilla could have simply said "conditioned," "raised," or even "born"
12 instead of "bred" to avoid the dehumanizing comparison of Black reproduction to
13 animalistic behavior. The issue, of course, is not simply reducing Blacks to animals, but
14 the nod to slavery. According to testimony from defense expert, Dr. Smith, Padilla's "bred
15 to lie" accusation was racially charged. *EH Transcript, 4/8/22*, pg. 59. Dr. Smith testified
16 that the terminology of "breeding" comes from the institution of slavery and related
17 eugenics movement. *Id*. at pg. 60. He also testified that Padilla's use of the term "bred"
18 suggests that Padilla "believes that African-American people are predestined for criminal
19 behavior, that it's part of their, quote, DNA." *Id*. at pg. 61.

20       It is also worth noting that Frieberg, as pronounced in open court, does NOT believe
21 it is racist to call an **adult** Black male a boy. *EH Transcript, 4/7/22 a.m.*, pgs. 87-88. Since

9

the Government continues to deny that Detective Frieberg ever said such a thing, it is worth including an excerpt from the transcript:

```
Mr. Payson: Do you agree that it is racist to call an
adult Black male a boy?
Det. Frieberg: No.
Mr. Payson: You think it is perfectly acceptable?
Det. Frieberg: I don't find that racist.
```

*Id.* As if it were even a question, Dr. Smith testified that it is very disparaging to call Black men boys. *EH Transcript, 4/8/22*, pg. 74. Although the Government attempts to sanitize the derogatory language used by law enforcement by calling the slurs "comments", simply naming them comments instead of slurs does not make them so. See *Gov't Response*, pg. 16.

### F. Response to Government's Itemized Objections

In an effort to make it easier for the Court to consider responses to the Government's itemized objections, the specific items numbers and descriptions are re-stated below.

Items 1 & 2

Item 1- "Any records or correspondence between the US Attorney's Office and the Pima County prosecutor's office regarding the dismissal of [] Mr. Jermaine Maxwell's 2/3/2016 matter [in] Pima County Case number CR20160695-001 and which alleged overt act 23 of count 1 and over act 12 of count 24. [pgs. 13 and 29 of 3rd SSI]."

Item 2- "Any records or correspondence between the US Attorney's Office and the Pima County prosecutor's office regarding the decision not to charge Mr. Troy Howell in Pima County with events stemming from his September 11, 2015 arrest by TPD and which is alleged as overt act 9 of Count 24 as well as Count 27 of the Third Superseding Indictment."

The Government objects to the Magistrate's order to disclose these items because, it alleges, they are internal prosecutorial policies and practices. *Gov't Objection*, pg. 21. The items, however, are not requests for any internal prosecutorial policy or documentation of practices. Rather, the items are narrowly tailored requests aimed at discovering more about the reason why charges were either declined or dismissed at the State level in favor of prosecuting the named defendants in the pending indictment. It is especially curious that Mr. Maxwell's State case was pending in court for three years at the time it was dismissed for "prosecutorial discretion" by Pima County prosecutor Bruce Chalk only for the same underlying incident to be charged via the USAO in the second superseding indictment (Doc. No. 811) a year later. *EH Transcript, 4/4/22*, pgs. 81-82.

The defense submits that the declination and dismissal were not mere coincidence, but in Agent Berlin's own words, a piece of the **law enforcement effort** not "to stop until [Mr. Gray] and everyone else goes to prison for the rest of their lives". See *Defense Exhibit 201*, pg. 7. Of course, because this request goes to law enforcement's selective actions, *Sellers* applies. In the alternative, should the Court agree with the Government that Items 1 and 2 fall under the selective prosecution umbrella, the defense submits that the racial animus harbored by law enforcement agents driving this case is at least "some evidence," per *Armstrong*, of discriminatory intent.

The Government next complains broadly that the Magistrate erred by ordering disclosure not in its possession. This is a strange assertion considering that Items 1 and 2 specifically request records or correspondences either sent, received, or otherwise in the possession of the U.S. Attorney's Office.

Finally, as to these items, the Government claims they should not be disclosed because they are work product. The work product doctrine protects from discovery, documents and tangible things prepared by a party or his representative in anticipation of litigation or for trial. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (citation omitted). "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *Nobles*, 422 U.S. at 237-38. The doctrine protects both "material prepared by agents for the attorney as well as those prepared by the attorney himself," *id.* at 238-39, and its primary purpose is to "prevent exploitation of a party's efforts in preparing for litigation," *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989). Work product protection can extend to interview notes, memoranda, summaries, and analyses. *See Hickman v. Taylor*, 329 U.S. 495, 511, 67 S. Ct. 385, 91 L. Ed. 451 (1947); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226-YGR(JSC), 2016 U.S. Dist. LEXIS 60551, 2016 WL 2606830 at *3 (N.D. Cal. May 6, 2016).

The records and/or correspondences sought by the defense and ordered by Judge Markovich are not protected by work product because they have nothing to do with Government's counsel's mental impressions or legal theories. If the Government can claim that the requested items are work product, then what stops it from proposing that the entire prosecution ought to be protected because it is a reflection of the Government's impressions and thoughts? Items 1 and 2 are discoverable as the defense has met its discovery burden and because there is no other theory preventing its disclosure.

Item 5

"Any notes, memoranda, emails, or reports to or from ATF SA Parkinson regarding the dismissal of the state prosecution of Mr. Jermaine Maxwell in CR20160695. (Parkinson testimony 4.4.22 p. 137-138)."

The Government objects to the Magistrate's order disclosing this item because, it argues, the request it vague, overbroad, and outside of its possession. It is hard to understand why the Government claims not to understand this request. The defense request is for materials within ATF Agent Parkinson's possession that might provide an explanation or motive for the dismissal of Mr. Maxwell's State case later charged in the pending federal indictment. For the reasons discussed in the previous section, the defense has met its discovery burden and the Government cannot properly claim work product as the material does not involve the mental impressions or legal theories of the prosecution.

Items 9 & 23

Item 9- "A copy of the email, or any other documentation, from Detective Frieberg's Sergeant that prompted entries in various TPD evidence control forms indicating that evidence should be held for seven years for a federal case. (Frieberg testimony, 4/7/22 p.m. transcript, pg. 17, lns. 2-9)"

Item 23- "Identification of the State case Det. Frieberg testified that involved a Hispanic defendant who was arrested, the complaint was dismissed, and his/her property was held for 5 years. (Frieberg testimony 4.7.22 Hearing at pp. 16-23)."

The Government's objection to Item 9 is moot because, perhaps unbeknownst to the prosecutor, the item was disclosed by the Government in Production 23.

As to Item 23, the Government posits that the defense request for this item incorrectly relies on a theory of non-conformance by law enforcement. The Government also suggests that because Detective Frieberg violates everyone's rights equally, the requested item cannot support a claim of selective enforcement.

13

First of all, non-conformance with established policies and procedures IS evidence of discriminatory intent. The Department of Justice, Civil Rights Division, has produced and published a legal manual titled, "Proving Discrimination—Intentional Discrimination". See *Title VI Legal Manual, Section VI*, https://www.justice.gov/crt/fcs/T6Manual6. The Manual explicitly provides that "departures from normal procedures" is circumstantial evidence probative of discriminatory intent.[3] *Id.*

Throughout the evidentiary hearing, there was consistent testimony that the law enforcement decision-makers in this case failed to follow their training, policies, procedures designed to protect defendants' rights. The Government's argument that law enforcement agents deviate from training and violate all kinds of policies and laws all the time, irrespective of race, is a red herring.

Consider the narrative that there is no such thing as white privilege. Let's say a white woman walks into a retail establishment and is immediately followed by store security. While the white woman may be concerned by such surveillance, she never once has to think about whether she is being followed because of her race. If, on the other hand, the same thing happens to a black woman, the first thing that comes to her mind is likely whether she is being surveilled because of her race. In the case at hand, where the defendants belong to a protected class and law enforcement has expressed racial animus,

---

[3] While the defense understands the Legal Manual is not about selective enforcement or prosecution, both civil and criminal theories require proof of discriminatory intent. There is no good reason why evidence considered in the civil context ought to be limited to civil applications, in particular when both Title VI and selective enforcement/prosecution theories have roots in the Equal Protection Clause.

the actions of law enforcement, and in particular, their deviation from protocol, is evidence of discriminatory intent. As such, the Magistrate's order that Item 23 be disclosed is neither contrary to law nor clearly erroneous.

<u>Items 14, 15, 16 and 25</u>

Item 14- "Copies of Tucson Police Department rules and regulations regarding the handling and disposition of seized property."
Item 15- "Copies of Tucson Police Department rules and regulations regarding the destruction of evidence."
Item 16- "Copies of Tucson Police Department rules and regulations regarding the retention of emails."
Item 25- "TPD's policy, procedures, and forms for conducting identifications."

The Government's primary objection is, again, that deviation from standard procedure is not evidence of racially based discriminatory intent. The defense has already addressed such an objection in the previous section.

Although the Government does not claim that such training materials are not ordinarily discoverable, its secondary objection is that the items are not within Government's control because they relate to TPD policies and procedures. In support of its position, the Government cites *United States v. Fort*, F.3d 1099 (9th Cir. 2007), alleging that *Fort* holds that "allowing 'local or state investigatory files subject to pre-trial discovery by a subsequently federally-indicted defendant, would in all likelihood inhibit cooperation between local and federal law enforcement agencies, to the benefit of criminals but to the detriment of the public good.'" *Gov't Objection*, pg. 28. Unbelievably, the Government's citation comes from the DISSENT in *Fort*, not the majority holding. The Government in no way indicates that it is citing from the dissent. The Court should find this very troubling.

*Fort* actually stands for the position that, "for the purposes of a federal prosecution of the same defendants for the same acts that were initially subject to the state or local investigation; specifically" where "those acts are alleged to establish a pattern of racketeering activity in a prosecution under state and local actors", the Government is subject to the disclosure obligations established by Rule 16. *Id*. at 1101.

Items 21 & 22

Item 21- "Documentation of Dets. Frieberg and Padilla's bias/anti-discrimination training."
Item 22- "Copies of bias/anti-discrimination training materials for the courses attend by Dets. Frieberg and Padilla."

The Government's objection to disclosure of these items is more of the same. The defense asks the Court to refer to the two immediately preceding section for a response. In addition, these items are especially important because the requested materials specifically cover bias/anti-discrimination. Evidence that law enforcement agents involved in this case attended such training and failed to act in conformance with the practices outlined in the training materials supports an inference of discrimination. That is, such failures are not simply deviation from standard procedure, but potentially evidence itself of discriminatory behavior.

Item 35

"Defendants' records and/or search results from any databases identified above."

The Government's objection is founded in its sophisticated fishing expedition theory. What the Government doesn't understand, but the Magistrate did, however, is that the entering of names into such gang databases is a subjective process. The decision to

place people into such databases is made by various law enforcement actors. Here, where the evidence demonstrates that law enforcement decision-makers harbored racist beliefs about black men in particular, defendants' placement in such databases should be discoverable. Certainly, the misplacement of defendants into these databases goes towards selective enforcement.

As previously stated, the remainder of the Government's (untimely) objections are addressed separately by Mr. Payson in Doc. No. 1774.

**Conclusion**

The Government's Objection fails to establish that Judge Markovich's discovery order is either contrary to law or clearly erroneous. This Court should also consider the disconcerting manner in which the Government objected to the Magistrate's Order. Perfectly aware that Agent Berlin was scheduled to testify on June 15th and 16th, the Government filed an untimely objection of the Magistrate's May 18th order to disclose, forthwith, items 38, 39, 44, and 45—all of which related to Agent Berlin's testimony.

What's more, the Government failed to request a stay of either this Court or the Magistrate. Instead, the Government cited Federal Rules of Criminal Procedure Rule 59(a) in support of its assertion that it was entitled to an automatic stay. See *Gov't Objection*, pg. 2, fn. 1. The problem, of course, is that Rule 59(a) ***does not*** provide for an automatic stay. Without a stay, the Government should have been required to comply with the Magistrate's order and disclose items 38, 39, 44 and 45 prior to Berlin's testimony. The Government did not. Instead, the Government waited until June 15th, the first day of Agent Berlin's testimony, to request a stay. By employing such a strategy, the defense was (by

17

design) without all of the Berlin related disclosure, including potential impeachment materials, during his testimony.

The defense respectfully requests that this Court affirm Judge Markovich's discovery orders and set a firm deadline for disclosure to ensure Government compliance.

RESPECTFULLY SUBMITTED this 17th day of June, 2022.

*s/ Jessica Turk*
JESSICA TURK
Attorney for the Defendant

*The above signed does hereby certify that, on the above date, she electronically transmitted this document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:*

Adam Rossi
Brian Hopkins
Julie Sottosanti
Assistant United States Attorneys

18